Filed 6/16/15  P. v. Wong CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>         Plaintiff and Respondent,<br><br>v.<br><br>ANDREW WONG,<br><br>         Defendant and Appellant. | A137584<br><br>(Alameda County<br>Super. Ct. No. 163657) |

Defendant Andrew Wong was convicted of the first degree murder of two bookies to whom he was in debt.  Prior to both murders, he exchanged electronic communications about his plans with a friend.  After the fact, he acknowledged the first killing to two other friends.  Defendant contends the trial court erred in permitting police opinion testimony regarding his guilt and failing to instruct the jury on accomplice testimony, as well as making several other claims.  We affirm.

## I.  BACKGROUND

Defendant was charged in an information, filed May 20, 2010, with two counts of murder.  (Pen. Code, § 187, subd. (a).)  With respect to both, it was alleged defendant personally and intentionally discharged a firearm, causing great bodily injury.  (Pen. Code, §§ 12022.7, subd. (a), 12022.53, subds. (b), (c), (d), (g).)  Special circumstances were alleged on the basis of the multiple murders.  (Pen. Code, § 190.2, subd. (a)(3).)

David Wells, a food delivery driver, was found dead in his van about 8:00 a.m. on July 31, 2008.  He had been shot twice in the left side of his face and head.  Cash was scattered inside the van near the body. The van was parked, engine running, in a lot next

to a soccer field in Alameda, along a route Wells frequently traveled early in the morning to make deliveries at the South Shore Safeway in Alameda. A passing police officer had seen Wells's van in the lot earlier that day, about 4:15 a.m. The dome light was on, and a person sat inside, reading. Wells had long conducted a side business as a bookie among people he knew through his work and social activities. Among his biggest customers was a group of employees at the South Shore Safeway.

Quang "John" Quach, an employee at the South Shore Safeway, was found dead in his apartment, sitting on his couch, on April 4, 2009. He had been shot once in the head. There were no signs of a forced entry or struggle. At the Safeway, Quach had acted as a go-between with a bookie, taking bets placed by other employees. The same gun had been used to kill both Wells and Quach.

Soon after the Quach killing, two informants pointed police to defendant, who also worked at the South Shore Safeway. Defendant knew both victims. Phone records revealed that Wells and defendant had traded telephone calls about 3:40 on the morning of Wells's death. Defendant was similarly on the telephone with Quach on the afternoon of his death.

Two days before Wells's death, defendant told a friend, through instant messaging, "I owe the mob" and the deadline for repayment was Thursday, the day of Wells's death. Defendant said his only options were to pay the debt or "[t]ake him out of the game," but he did not have enough money to pay. In late July or early August 2008, during a conversation with the same friend, defendant told her he had "murdered someone." The killing had "something to do with the gambling."

A second friend would sometimes talk with defendant about his "problem with his gambling." Defendant confessed the same killing to this friend, identifying Wells by name and referring to him as "my bookie." On April 1, 2009, a few days before the Quach killing, defendant told this friend he needed $5,000 to "pay off someone."

Police arrested defendant on April 9, 2009. The first call he placed after being taken to jail was to Michael Chang, a friend whom he had known since childhood. Chang testified under a grant of immunity. Chang sold defendant a revolver at some

2

point prior to the Wells killing. The prosecution presented electronic messages between the two, referred to as "chat logs," shortly before the killing in which defendant discussed the possibility of killing a bookie to whom he owed money. Afterwards, defendant sent Chang an electronic link to an article discussing Wells's murder. Defendant also gave Chang a garbage bag containing, defendant told Chang, his clothes and the "murder weapon." At defendant's request, Chang returned these items to him barely a week later. Defendant told Chang he had killed Wells, explaining he met Wells by a soccer field at night and paid Wells some of the money he owed him. While Wells was counting the money, defendant told Chang, he shot him. Defendant said he owed Wells $5,000, which "he either did not have or did not want to pay."

Defendant also told Chang about the Quach killing. At the time, defendant owed about $4,000 to the bookie for whom Quach took bets. Again, defendant did not have the money to pay his debt. He told Chang he went to Quach's house, where the two watched television. When defendant got an opportunity, he shot Quach. Soon after the killing, defendant again gave Chang a garbage bag containing clothes and a gun and asked Chang to hold it for him. The gun was the same one Chang had sold to defendant. After defendant's arrest, Chang left the clothes on a street in Oakland and tossed the gun off the Bay Bridge. The prosecution also introduced chat logs between the two in which defendant discussed with Chang the possibility of the Quach murder prior to its occurrence.

While defendant was being held at the police station following his arrest, he was allowed to visit with his mother. A translation of their conversation, which occurred in a dialect of Cantonese, was read to the jury. Although the conversation was vague, in response to his mother's request that he tell her what he did, defendant acknowledged having "hit" someone over "[g]ambling money." When his mother told him, "If you did this, you must admit it," defendant responded, "Yes, I did it. I have to sit in for life [*sic*]."

The jury found defendant guilty on both counts of first degree murder and found the sentencing enhancement and special circumstances allegations to be true. Defendant was sentenced to life without the possibility of parole, plus 50 years.

## II. DISCUSSION

Defendant contends the trial court erred by permitting a police officer to provide lay opinion testimony, failing to instruct the jury on accomplice testimony in connection with Chang's testimony and on third party culpability, allowing the prosecution to vouch for Chang's veracity, admitting involuntary statements made by defendant to his mother, and excluding exculpatory evidence.

### A. *Police Opinion Testimony*

One of the police officers involved in investigating the Wells and Quach killings testified about the investigation. Defendant contends the officer was permitted to offer impermissible lay opinions in the course of the following colloquies:

1.      "Q. Now, looking at those calls, . . . what does that tell you about [defendant's] location?

"A. It tells me that he was lying about his location.

"[DEFENSE COUNSEL]: Your Honor, at this point, object as to improper opinion evidence as to whether or not my client was lying based upon this witness's—

"THE COURT: We can characterize it differently than that. [¶] What does that tell you about where he was?

"THE WITNESS: It tells me that he was near the cell tower where the call was made, Your Honor.

"THE COURT: And that's different from what he told you in the interview?

"THE WITNESS: Yes, Your Honor."

* * * *

2.      "Q. Based on what you heard, do you believe that there was another individual out there who had committed the crimes in this case?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: Overruled. You can answer that.

4

"THE WITNESS:  Another individual beyond [defendant]?

"[PROSECUTION] Q.  Yes.

"A.  No."

* * * *

**3.**  "Q.  And can you—the motive was—first of all, before that, what did you believe or before that particular interview, what did you believe the motive for this crime was?

"[DEFENSE COUNSEL]:  Objection.  Improper opinion evidence, irrelevant, 352.

"THE COURT:  Overruled.  You can answer.

"THE WITNESS:  I believe it was a debt, a gambling debt."

* * * *

**4.**  "Q.  Now, did you learn any information about [Quach's] habits in relation to gambling.

"A.  Yes.

"Q.  And was that information important in your investigation?

"A.  Yes.

"Q.  And why was it important, first of all?

"A.  It was important because ultimately that was the motivation for the murder.

"[DEFENSE COUNSEL]:  Objection.  Improper opinion evidence.

"THE COURT:  Overruled."

Defendant argues the first interchange involves the offer of an opinion as to defendant's veracity, the second as to defendant's guilt, and the third and fourth as to defendant's motives and, implicitly, guilt.

Opinion testimony by an expert is admissible in a criminal prosecution "in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience."  (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.)  An expert, however, "may not express an opinion on a defendant's guilt.  [Citations.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  'Rather, opinions on guilt or innocence are

5

inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405 (*Bryant*).)

As to the first interchange cited by defendant, we find no abuse of discretion. After defense counsel objected to the answer, the trial court implicitly sustained the objection by taking over the examination. The court's subsequent questions were not improper. They merely asked the officer how he interpreted the cell phone information and whether that was consistent with the information provided by defendant to police during his interview. The resulting nonobjectionable testimony, that defendant's account to police was inconsistent with his location as determined by the cell phone data, was the functional equivalent of the officer's original answer. Admission of the original opinion testimony was therefore harmless.

Defendant notes the practice of determining a caller's location from cell phone data was a subject of dispute at trial and contends the officer was permitted to give a lay opinion with respect to this dispute in offering his interpretation of the cell phone data. The argument is based on a mischaracterization of the nature of the expert dispute. What was in dispute was the *precision* of the locational information properly derived from cell phone data. The cell phone calls in question had been picked up by a cell phone tower in Oakland, at a time when defendant claimed to be San Leandro. Defendant's expert testified that the information was not precise enough to place defendant near Quach's home in Oakland. Defendant's expert did not, however, testify that no locational information could be derived from the records at all. In particular, he did not claim the cell phone information was insufficiently precise to distinguish between locations in Oakland and San Leandro, the distinction drawn by the officer in his testimony. On the contrary, the expert conceded that when the cited calls occurred defendant's cell phone was somewhere in Oakland and "could have been at the Quach scene." Because there

6

was no genuine dispute as to the inference drawn by the officer in his testimony, it did not tread in territory properly left to experts.

We agree with defendant that the second question, seeking the officer's opinion as to whether there was someone else at large who committed the killings, sought an improper opinion about defendant's guilt. Necessarily, if the officer offered the opinion no one else had committed the killings, he was offering the opinion defendant *had* committed them. The trial court abused its discretion in overruling the objection to this line of questioning, but any error was harmless. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 77.)

The officer's testimony regarding defendant's motive, however, was not as clearly improper. Motive is not an ultimate issue in a murder prosecution. (*People v. Lewis* (2001) 26 Cal.4th 334, 370 (*Lewis*).) Contrary to defendant's argument, it is not subject to the strict rules that govern opinions regarding guilt or the elements of a crime. (See *People v. Killebrew* (2002) 103 Cal.App.4th 644, 658, overruled on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1045–1049 [expert testimony about individual's intent and knowledge in gang prosecution improper].)[1] The officer's opinion was therefore admissible if it would "assist the jury to understand the evidence or a concept beyond common experience." (*People v. Torres, supra,* 33 Cal.App.4th at p. 45.) Because the motivational effect of debt is easily within the common experience of jurors, we are compelled to conclude the officer's opinions were unlikely to be helpful and should not have been admitted—particularly since, as defendant argues, an opinion about motive can be construed as an implicit opinion on guilt. Nonetheless, any error was not prejudicial, as discussed below.

---

[1] The primary case cited by defendant, *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 293–294, in which we held expert testimony about the motive for an adverse employment action was improper, is inapplicable. Unlike motive in a typical murder prosecution, wrongful motive is an element of a cause of action for civil employment retaliation.

7

Errors in the admission of evidence are governed by the standard of *People v. Watson* (1956) 46 Cal.2d 818, which holds that the error is prejudicial only if it is reasonably probable the jury would have reached a different decision in the absence of the error. [2] (*Watson*, at p. 836.)  The evidence supporting defendant's convictions was very strong.  The same gun was used in both murders, suggesting a connection.  Defendant not only knew both victims, but was also in telephone contact with both within hours of their murders.  He had fallen into debt with both victims.  He admitted both killings to others, the Wells killing repeatedly.  His electronic communications with Chang, provided to the jury, confirmed defendant's planning and execution of the killings in his own words.  In particular, these communications cited debt as the motive for the killings.  Defendant's description of the manner of both killings to Chang fit with the forensic evidence, down to the cash scattered in Wells's van.  In the face of this evidence, the officer's testimony to his opinions of defendant's motives and guilt were not likely to have had a material impact on the jury's decision.

**B.  *Accomplice Instruction***

As discussed above, Chang testified he sold defendant the gun used in both murders, was told about defendant's plans for both murders before they occurred, received from defendant a bag containing his clothes and the gun after both murders, and disposed of the gun and clothing after the last killing.  With respect to Chang's testimony, defendant contends the trial court erroneously failed to instruct the jury on the principles

---

[2] Defendant argues prejudice should be measured by the constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, because he was denied due process by the admission of the opinions.  Our Supreme Court has cautioned repeatedly " 'garden-variety evidentiary questions' " should not be " 'inflate[d]' " into constitutional error through the claim of a due process violation.  (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)  While we reject the claim of a due process violation, our conclusion regarding prejudice would not be different under the constitutional standard.

We also reject defendant's claim of prosecutorial misconduct in connection with these questions.  The issue was not properly preserved for appeal (see *People v. Lopez* (2013) 56 Cal.4th 1028, 1072) and, as discussed in the text, the testimony was not prejudicial (*People v. Trinh* (2014) 59 Cal.4th 216, 249).

of law applicable to accomplice testimony, such as the requirement of corroboration. The trial court denied defense counsel's request for such instructions, finding Chang's actions did not "meet all three requirements to make him an aider and abetter."

The trial court must instruct the jury regarding the testimony of an accomplice if "there is evidence from which the jury could find that a witness is an accomplice to the crime charged . . . . But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony." (*People v. Horton* (1995) 11 Cal.4th 1068, 1114.) In other words, the instructions must be given if there is substantial evidence to support a finding of accomplice liability. (*People v. Boyer* (2006) 38 Cal.4th 412, 466.)

" ' "[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime . . . ." [Citation.] "In order to be an accomplice, the witness must be chargeable with the crime as a principal [citation] and not merely as an accessory after the fact." ' " (*Bryant, supra*, 60 Cal.4th at p. 429.) " 'Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice.' " (*Id.* at p. 430.) "Accessories . . . (defined as persons who, after a felony has been committed, harbor, conceal or aid a principal in the felony with the intent that the principal avoid criminal liability therefor and knowing that the principal has committed the felony or been charged with or convicted thereof), are not accomplices as to whose testimony corroboration is required." (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 103.)

There is no evidence Chang aided defendant in the commission of these crimes prior to their commission, at a time when he had knowledge of defendant's plans. Chang discussed the killings with defendant prior to their occurrence, but mere knowledge of a crime does not make one an accomplice. (*Lewis, supra*, 26 Cal.4th at p. 369.) He sold defendant the murder weapon, but Chang testified the sale occurred before defendant told him about his plan to kill Wells. While Chang provided assistance to defendant after the

9

Wells killing by holding the garbage bag, this merely made him an accessory. Chang's return of the garbage bag, thereby supplying defendant with a gun once again, occurred months before defendant told Chang of his plan to kill Quach, and there is no evidence to support defendant's claim that Chang knew defendant intended to use the gun to kill when he returned it. We also find it insufficient that, when defendant told Chang of his plan to kill Quach, Chang asked defendant, "[W]hy not outside though. That's more safe." Contrary to defendant's characterization of the query as seeking to assist in planning the murder, it appears to be a simple question regarding an obvious fact. There is no evidence the query did, in fact, aid or encourage defendant.

We can find only one plausible theory of accomplice liability. If Chang had decided, after learning of defendant's plan to kill Quach but before the actual killing, that he would once again assist defendant by accepting the garbage bag, he could have been found to be an accomplice. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [an accomplice's intent to aid must be formed prior to or during commission of the offense].) There is, however, no evidence to support such an inference. Chang did not testify that defendant asked him to take the bag in advance of the killing, nor did Chang say he considered the issue at that time, let alone made up his mind to assist. As a result, such a theory would rest on speculation. (See *Lewis, supra*, 26 Cal.4th at p. 369; *People v. Sully* (1991) 53 Cal.3d 1195, 1228 [no need to instruct where theory of accomplice liability "highly speculative"].)

Even if the trial court was required to instruct regarding accomplice testimony, the court's failure was not prejudicial because Chang's testimony was well corroborated. "Even where accomplice instructions were required, we have found no prejudice where, in fact, the witness's testimony was sufficiently corroborated. [Citation.] ' "Such [corroborative] evidence 'may be slight and entitled to little consideration when standing alone. [Citations.]' " [Citation.] "Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that [such] evidence be sufficient in itself to establish every element of the offense charged.' " ' " (*People v. Boyer, supra*, 38 Cal.4th at p. 467.)

10

" 'The [corroborating] evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Brown* (2003) 31 Cal.4th 518, 556.)

There was sufficient evidence to corroborate defendant's culpability for both murders. As to the Wells murder, defendant admitted the killing to two other friends. Nothing more is necessary. As to the Quach murder, there was evidence defendant was in cell phone contact with Quach on the afternoon of the killing and was distressed about his gambling debt to the bookie with whom Quach worked, just as he had been distressed about his debt to Wells. The jury could have inferred a similar motive resulted in a similar crime. Further, the chat logs between defendant and Chang confirmed much of Chang's testimony. Finally, defendant's admission to his mother that he "did it" after having been arrested shortly after the Quach killing could be understood to relate to that crime. Defendant focuses on expert testimony regarding activity on his and Quach's computers and cell phones to suggest he could not have committed the Quach killing, but the existence of corroborating evidence does not depend upon the absence of contrary evidence. Corroborating evidence must only be sufficient to persuade the jury of the credibility of the accomplice's testimony.

## C. *Prosecutorial Vouching for Chang's Credibility*

During his closing argument, the prosecutor discussed with the jury various factors to be considered in evaluating the credibility of witnesses. With respect to Chang, in particular, the prosecutor acknowledged "some people may not like Michael Chang," but he argued the pertinent issue was Chang's credibility, not his likeability. After an extended discussion of the forensic and other evidence relating to the Wells murder, the prosecutor argued that it supported the testimony provided by Chang, summing up by stating, "So yeah, you may not like [Chang] for many different reasons, but [Chang] was telling you the truth when he took the witness stand. And the chat logs, the evidence and even other witnesses, corroborated what [Chang] told you."

During the defense closing, counsel characterized Chang as "tainted" and argued, "If you believe all of this evidence[,] you have to believe that Michael Chang knew what

11

was going on and participated in it."  Referring to the electronic communications discussing defendant's planned murders, defense counsel argued:  "All of this [information] Michael Chang was completely privy to, yet he's given the [immunity] deal before the prosecution had any awareness.  Then he gets to the stand and then he testifies. [¶] . . . [¶] They didn't know about these chat logs until almost two years later."  Counsel also pointed to Chang's denial of knowledge and involvement when first interviewed by police, arguing it demonstrated he could not be believed:  "He's supposed to tell the prosecution the truth and he didn't."[3]

Addressing defense attacks on Chang's character in rebuttal, the prosecutor noted: "I can see Michael Chang may not be the finest human being on the face of the planet.  In fact if my grandmother met Michael Chang, what she would say, ['T]hat boy, Michael, umm, he ain't no angel, but he ain't no devil either.[']  And that's the truth about Michael Chang.  He ain't an angel.  He ain't the devil.  He is what he is."  Later, in discussing Chang's immunity agreement, the prosecutor told the jury:  "We gave Michael Chang a deal. . . . You need to understand that when an individual is involved in a negotiation like that, they give you just enough information so that we can make a decision. . . . [¶] . . . [¶] . . . But ladies and gentlemen, just because he got a deal, don't mean that he lied.  And the fact that at some point in time he didn't tell us, hey, these chat logs, we were talking about it on the chat log, that's not really how it works.  I mean, we bring people in here, we put them up there on that witness stand.  We asked them very specific questions and we want them to answer that specific question.  If they get astray, we try and bring them back."  Counsel illustrated this point by saying, "experts have a tendency to want to go on and on about things.  Sometimes you got to cut them off and bring them back.  That's the way that we want trials to go."  Returning to Chang, the prosecutor addressed the chat logs:  "Now, [Chang] didn't tell me about the chat logs.  He didn't.  I didn't ask.  I never thought to ask about chat logs or anything like that until they were discovered.  I'm going

---

[3] The circumstances of Chang's cooperation and his statements to the prosecution were the subject of extensive cross-examination.

to be honest with you.  But once they were discovered, he never ever lied.  Absolutely, every question we asked him, every time we asked him to explain something, he absolutely did."

Quoting the prosecutor's references to Chang's truthfulness out of context, defendant argues they constituted improper vouching for his veracity.  As a claim of prosecutorial misconduct, this was forfeited when defense counsel failed to object to any of the prosecutor's arguments at trial.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1207 (*Linton*).)  Yet even if it had been properly preserved, we would find little merit in the argument.

A " 'prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom' [citation], and in his argument to the jury the prosecutor may comment upon the credibility of witnesses 'in the light of all the evidence in the case.' " (*People v. Perez* (1962) 58 Cal.2d 229, 245, overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 32, 34.)  Accordingly, a prosecutor "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " (*People v. Turner* (2004) 34 Cal.4th 406, 432.)  "Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.]  Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' " (*Linton, supra*, 56 Cal.4th at p. 1207.)  "[S]uch statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  The critical inquiry is whether the prosecutor's comments are likely to be understood as based on matters outside the record. (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.)

The first example cited by defendant, that the prosecutor stated "[Chang] was telling you the truth when he took the witness stand" was proper argument.  It was the

conclusion of an extended review of the evidence and relied entirely on the trial record. (See, e.g., *People v. Anderson* (1990) 52 Cal.3d 453, 479 [arguments about a witness's veracity proper when restricted to evidence in the trial record].)

The second example, the prosecutor's characterization of Chang as "no devil"—in context, that Chang "ain't no angel, but he ain't no devil either" —was not addressed to Chang's veracity, but rather to his character. Nothing in the comment, which was at best a tepid defense of the witness, suggested the prosecutor was basing his judgment on facts outside the record, nor did he invoke his personal prestige or that of his office in defense of Chang. It did not constitute misconduct.

The meaning of the third example, the prosecutor's comment that "If [witnesses] get astray, we try and bring them back," is not clear. Because it immediately followed a discussion of Chang's cooperation, there is some plausibility to defendant's argument that the comment "conveys to the jury the message that it may rely on the integrity of the district attorney's office when assessing the credibility of Chang." Yet based on the prosecutor's explanation of this comment by reference to expert witnesses, it appears to have been intended to refer to the difficulty of controlling the presentation of witness testimony, given the tendency of their answers to stray from the questions asked. On the current record, particularly in the absence of a defense objection, there is no way to determine whether the prosecutor's meaning was improper.

The last example, the prosecutor's comment that, once the chat logs were discovered, Chang "never ever lied" during his dealings with the prosecution, is more problematic. While the prosecutor did not suggest his evaluation of Chang's cooperation was based on facts outside the trial record, neither did he explain the basis for his conclusion about Chang's truthfulness.

We decline to resolve the propriety of the final two comments because, in addition to defendant's failure to preserve the issue for appeal by objecting and seeking an admonition, the comments were harmless. (*People v. Turner, supra,* 34 Cal.4th at p. 433 [prosecutorial vouching provides no basis for reversal if there is no reasonable probability it affected the jury's decision].) As discussed above, the evidence supporting defendant's

14

convictions was very strong. Many aspects of Chang's testimony were confirmed by defendant's electronic communications, as well as the testimony of other witnesses. The prosecutor's comments were unlikely to have influenced the jury's decision.

## D. *Involuntary Statements*

Defendant contends that his statements to his mother should have been suppressed because they were involuntary.[4]

When defendant was arrested at a gas station, he was tackled and suffered a cut to his head that required stitches. He was released from the hospital after being cleared for interrogation and taken to an interrogation room at police headquarters, where he was kept from 8:42 p.m. to 11:14 a.m. the next day. When asked by police about his injury, defendant assured them he was "fine," and he never complained of pain during the course of the interrogation. Prior to any questioning, he was fed. Beginning at 1:00 a.m., defendant was questioned for two and a half hours. After a 90-minute break, he was questioned again for about two hours, until 7:00 a.m. After a two-hour break, at 9:00 a.m., defendant was given breakfast. During the breaks from questioning, defendant had an opportunity to sleep, although it is not clear whether he actually did so. At 9:45 a.m., he met alone with his mother for 15 minutes. After she left, defendant was questioned for an additional 18 minutes, until he told police he no longer wanted to talk and was removed to his jail cell.

Based on defendant's injury and the extended duration of the interrogation, which occurred throughout the night, defendant moved in limine to suppress statements made during his interrogation, including his conversation with his mother. The trial court denied the motion, concluding "defendant was properly advised, he made a knowing, intelligent waiver of his right, his waiver of right was voluntary. Any statements he made were not caused by any illegal promises or threats, they were voluntarily made, and they are admissible against him."

---

[4] Although defendant refers more generally to the suppression of his statements during the interview, he does not point to any incriminating statements he made to the police while in custody.

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.  [Citations.]  ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." '  [Citation.]  The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " '  [Citations.] [¶] ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.  [Citation.]  Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.'  [Citation.]  The statement and the inducement must be causally linked. [Citation.]" [Citation.]' [Citation.]  A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession.  [Citation.] [¶] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.'  [Citation.]  'Whether a confession was voluntary depends upon the totality of the circumstances.' " (*Linton, supra*, 56 Cal.4th at p. 1176.) "Relevant considerations are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

" 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.'  [Citation.]  The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*Linton, supra*, 56 Cal.4th at pp. 1176–1177.)

Upon an independent review of the record, we find no reason to disagree with the trial court's decision.  As defendant recognizes, his conversation with his mother is not considered the equivalent of a police interrogation.  (*People v. Tate* (2010) 49 Cal.4th 635, 685–686.)  Even were that not the case, we find no circumstances that would have rendered his statements to his mother involuntary.  Although defendant was injured

16

during his arrest, he was cleared for release by the hospital and assured the officers he was able to talk with them. Throughout the interrogation, he expressed no discomfort. There is no reason to believe the head wound rendered him unable to exercise his free will.

The interrogation did occur over an extended period in the middle of the night, but it was not "the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary." (*Linton, supra*, 56 Cal.4th at p. 1178.) As the Attorney General points out, defendant would have been less affected than most by the overnight session, since he worked the night shift. While the two primary interview sessions lasted two and two and a half hours, there was a break of similar length between them, during which defendant was permitted to rest. Immediately before the visit from his mother, defendant had been given an additional two-hour rest and breakfast. There is no reason to believe the circumstances of the detention undermined his will. On the contrary, his behavior during the actual interrogations suggests the opposite. Defendant did not confess to the officers, and when he tired of speaking with them, he told them so.

Defendant emphasizes the potential effect of his injury, relying on *People v. McElheny* (1982) 137 Cal.App.3d 396 (*McElheny*), which involved intentional police brutality. The accomplice of the defendant in *McElheny* shot a police officer and was then killed in turn. After the defendant was caught, he was beaten about his body, including his testicles, with a billy club. The police then pressed his face into the body of his dead accomplice, before threatening to throw him in a police vehicle with snarling dogs. (*Id.* at pp. 399–400.) The court held that a confession obtained within hours of such mistreatment could not be deemed voluntary.[5] (*McElheny,* at pp. 402–403.) There is no evidence of the same type of terrorizing mistreatment here, nor was the apparently

---

[5] *McElheny* was also rendered at a time when the prosecution was required to prove beyond a reasonable doubt that the confession was voluntary. (*McElheny, supra*, 137 Cal.App.3d at p. 402.) The current standard requires a preponderance of the evidence. (*Linton, supra*, 56 Cal.4th at p. 1176.)

17

accidental injury suffered by defendant likely to have induced the same emotional trauma as the brutality in *McElheny*.

## E. *Exclusion of Evidence of Wells's State of Mind*

Prior to trial, the prosecution moved in limine for a hearing to determine the admissibility of evidence of third party culpability for the Wells killing. In response, the defense stated it intended to call two witnesses who would testify about Wells's encounters with persons who he believed posed a threat to him. The first witness would to testify that Wells described "a 6'2" black transvestite" who had asked him for a ride at a San Leandro warehouse. The second witness was prepared to relate a conversation in which Wells told her a "tall white male with stringy hair" had approached him from behind and asked for a cell phone while Wells was unloading his van. Later that day, Wells went to a bar and saw the same man sitting at the end of the bar. Wells was unnerved by the encounter. The defense argued the two witnesses would not be presented for purposes of establishing third party culpability but instead to show that Wells was a fearful person and therefore unlikely to have agreed to meet defendant early in the morning in a deserted area. The court granted the motion in limine, finding the defense theory of Wells's mental state "too speculative." Defendant contends this ruling was error.[6]

"[D]ue process requires state courts to admit reliable evidence that is critical to the defense in criminal cases." (*People v. Vines* (2011) 51 Cal.4th 830, 864.) Nonetheless, " ' "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." ' " (*People v. Lucas* (2014) 60 Cal.4th 153, 270.) Under California rules of evidence, "[o]nly relevant evidence is admissible. [Citation.] Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case.

---

[6] Defendant concedes the testimony was inadmissible hearsay if offered to prove the fact of Wells's encounters, as opposed to their expression of his mental state.

18

[Citation.] Inferences drawn from the evidence must be logical and reasonable, not merely speculative." (*Bryant, supra*, 60 Cal.4th at p. 405.)

While recognizing the importance of permitting the defense to introduce relevant exculpatory evidence, we find no abuse of discretion in the trial court's exclusion of the two witness accounts. The situations described by the witnesses were simply too different from the circumstances of the crime to permit a reasonable inference about Wells's state of mind in agreeing to meet defendant. The two stories involved threatening-looking strangers who approached Wells and asked him for things. He was frightened by the encounters. In contrast, defendant was familiar to Wells, and there was no evidence to suggest Wells had any reason to view defendant as a physical threat. Further, Wells was accustomed to being out early in the morning in the general neighborhood where he met defendant, since it was part of his daily routine. To infer Wells was unlikely to have met with defendant before beginning his delivery route merely because encounters with threatening strangers frightened him was, as the trial court held, speculation. In any event, exclusion of this evidence was harmless given the strong evidence connecting defendant to the Wells murder, including defendant's acknowledgement of the killing to three different persons. (*People v. Watson, supra,* 46 Cal.2d 818, 836.) Because we find exclusion of the evidence proper under state rules of evidence, we find no substance in defendant's argument he was denied the constitutional right to present a defense. (*People v. Bacon, supra,* 50 Cal.4th 1082, 1104, fn. 4.)

**F. *Third Party Culpability Instruction***

Defendant requested the following jury instruction regarding third party culpability: "The defendant in this case has introduced evidence for the purpose of showing that another person committed the crime for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant committed the charged crime, you must find him not guilty." The court denied the request.

"A trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case, but it need not give an argumentative or duplicative instruction." (*People v. Harris* (2013) 57 Cal.4th 804, 853.) Our Supreme Court has consistently ruled that the refusal to give third party culpability instructions like the one proposed by defendant is not prejudicial because the proposed pinpoint instructions essentially duplicate the standard instructions on burden of proof and reasonable doubt. (E.g., *Harris*, at pp. 853–854; *People v. Hartsch* (2010) 49 Cal.4th 472, 504; *People v. Abilez* (2007) 41 Cal.4th 472, 517.) As explained in *People v. Gutierrez* (2009) 45 Cal.4th 789, "the jury was instructed . . . that a criminal defendant is presumed innocent, that he is entitled to a verdict of not guilty if the jury has reasonable doubt regarding his guilt, and that the prosecution bears the burden of proving a defendant guilty beyond a reasonable doubt. Because the jury was properly instructed as to these issues, and because the jury could have acquitted defendant had it believed that a third party was responsible for [the victim's] death, no third party culpability instruction was necessary." (*Id.* at pp. 824–825, fn. omitted.) As the court held more recently: " 'It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes.' [Citation.] [¶] Had the jury entertained a reasonable doubt that someone else committed any homicide it would have acquitted defendant . . . . Consequently 'no special instruction on third party culpability was necessary to apprise the jury of the pertinent legal principles . . . .' " (*People v. Lucas, supra*, 60 Cal.4th at p. 288.) That was particularly true here, since the proposed instruction—"If, after a consideration of all the evidence, you have a reasonable doubt that the defendant committed the charged crime, you must find him not guilty"—merely replicated the reasonable doubt instruction. Accordingly, the trial court did not commit prejudicial error in declining to give defendant's proposed instruction.

## III. DISPOSITION

The judgment of the trial court is affirmed.

20

_____

Margulies, J.

We concur:

_____

Humes, P.J.

_____

Dondero, J.